U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 0 8 2006

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| ISRAEL TIPPITT | CIVIL ACTION NO.: 05-1092 |
| VERSUS | JUDGE DRELL |
| COMM. OF SOCIAL SECURITY | MAGISTRATE JUDGE KIRK |

### REPORT AND RECOMMENDATION

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Israel Tippitt ("Tippitt") Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Tippitt is not disabled and not entitled to benefits.

Tippitt was born in 1963 (R. 202), has an eleventh grade education (R.223), and has no vocationally relevant past work experience[1] (R. 20). He filed applications for DIB and SSI on

---

[1] While Tippitt had no vocationally relevant past work experience, he worked numerous jobs prior to his onset date, working two jobs during some periods of time. Tippitt's work history indicates that he worked as a pie maker at Domino's Pizza from January 1991 through April 1994, and as a printer at a printing company from November 1992 through April 1994. He was a packer at a canning plant from August 1994 through January 1995, and a janitor at a cleaning business from January 1995 through March 1997. Tippitt was employed as a housekeeper at a casino from August 1997 through November 1999, as a grounds keeper for a property maintenance company from January 2000 through April 2000, as a maintenance man at a truck stop from April 2000 through March

September 11, 2002, alleging a disability onset date of May 1, 2002, due to angina, hypertension, and kidney disease. (R. 49-51, 55, 202-204.) Tippitt's claim was denied initially, and a request for hearing was timely made. A hearing was held on November 14, 2003 (R. 219), and on November 27, 2004, the ALJ issued a decision unfavorable to the claimant. Tippitt filed a request for review with the Appeals Council; however, the Appeals Council denied review, and the decision of the ALJ became the final decision of the Commissioner.

To qualify for disability insurance benefits, a claimant must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

To qualify for SSI benefits, a claimant must file an

---

2002, and as a housekeeper at a casino from July 2002 through August 2002. (R. 68.)

application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, a claimant must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. A claimant must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the

record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Issues

Tippitt raises the following issues for review:

(1) Whether the ALJ erred in finding that Tippitt had only two severe impairments;

(2) Whether the ALJ failed to give controlling weight to the opinion of Tippitt's treating cardiologist;

(3) Whether the ALJ erred in finding that Tippitt was not wholly credible;

(4) Whether the ALJ erred in his reliance on the medical

4

vocational guidelines to determine non-disability;

(5) Whether the Appeals Council failed to properly consider new and material evidence of mild mental retardation and significant adaptive deficits, and its impact on claimant's condition.

Factual Background

Tippitt was treated at Freedman Memorial Cardiology Associates from 1999 through 2003 for chest pain. He was initially diagnosed with hypertension. (R. 91-100.) Tippitt underwent a consultation at Christus St. Frances Cabrini Hospital in Alexandria, Louisiana, on September 20, 1999, due to chest pain. Dr. Preston's impression, after examination and review of Tippitt's ECG revealed diffuse ST elevation with a depression noted in AVR. (R. 103.) An echo was performed and it revealed a mild increase in left ventricular mass consistent with mild concentric hypertrophy (thickening) of the left ventricle (the main pumping chamber of the heart)[2]. There was mild mitral regurgitation. The doctor noted that Tippitt had a history of coronary artery disease. (R. 103.)

In August 2002, Tippitt had an abnormal ECG with ST elevation and left ventricular hypertrophy. Radiologic studies revealed slight hyperexpansion of the lungs and mild cardiomegaly (enlargement of the heart[3]). A renal ultrasound showed bilateral renal disease of moderate severity, with some evidence of scarring

---

[2] www.medlineplus.gov

[3] www.medlineplus.gov;
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=cardiomegaly

5

in the left kidney. (R. 105-107, 110.)

On November 6, 2002, Dr. Romel Wrenn, a cardiologist with Cenla Heart Specialists, wrote a letter to the Louisiana Office of Disability Determinations stating that Tippitt was under his care, as well as the care of Dr. Mark Wilson, nephrologist, and Dr. Anthony Amigo, primary care physician. (R. 120.) Dr. Wrenn stated that Tippitt suffered from hypertension and angina pectoris. Tippitt's stress test was abnormal due to angina type discomfort and evidence of septal hypokinesis and anterior wall motion perfusion abnormality. The left ventricular ejection fraction was 51% during stress and 49% at rest. (R. 120.) Dr. Wrenn opined that Tippitt was "unfit for continuation of gainful employment." Dr. Wrenn noted that Tippitt was unable to undergo a heart catheterization due to significant renal insufficiency. (R. 120.) In September 2002, Tippitt's chart indicated that he was taken off of Accupril, but was to increase the dosage of Toprol. (Doc. 128, 169.)

An October 25, 2002 report by Dr. Wilson, a nephrologist, stated that he treated Tippitt in August 1999 and September 17, 2002. Dr. Wilson stated that Tippitt had "moderate renal insufficiency." Dr. Wilson opined that Tippitt's renal disease should not cause significant disability. (R. 133.) On November 12, 2002, Dr. Wilson noted that Tippitt had been take off of the medication Accupril because it could be leading to his renal

6

disease. (R. 130, 128.)

Tippitt returned to Cenla Heart Specialists in November 2002 and April 2003. He was in no distress at the time of either visit, but still had complaints of chest paint and shortness of breath. (R. 167.) According to the doctor's notes, Tippitt was still taking 40 mg of Accupril, as well as other medications. (R. 166.) Tippitt followed up with Cenla Heart Specialists in July and November of 2003, as well as March and May 2004. (R. 210-216.) He continued to have occasional chest pain without activity as well as muscle cramps in his hands, feet, and legs. (R. 210-216.)

A DDS medical consultant, Dr. Hollis Rogers, MD, performed a residual functional capacity assessment on December 8, 2002. Dr. Rogers found that Tippitt could lift/carry a maximum of 50 pounds occasionally and 25 pounds frequently; he could stand/walk a total of about 6 hours in an 8-hour day; he could sit a total of about 6 hours in an 8-hour day; he had unlimited ability to push and pull. (R. 146-150.) Dr. Rogers also noted that Tippitt should avoid moderate exposure to extreme cold or heat, wetness, and humidity. (R. 150.)

Dr. Wrenn completed a medical source statement in October 2003, opining that Tippitt could lift/carry less than ten pounds occasionally and ten pounds frequently, could sit less than 6 hours in an 8-hour day, and had the following environmental limitations: temperature extremes, dust, vibration, humidity/wetness, hazards,

and fumes/odors/chemicals. (R. 175-176.) Specifically, Dr. Wrenn stated that Tippitt was at an increased risk for unstable angina or a heart attack if exposed to noxious stimuli; Tippitt could not tolerate physical or mental stress; Tippitt could not tolerate full or part time work. (R. 177.) Dr. Wrenn found that Tippitt was limited in his ability to push/pull with his upper and lower extremities and could only occasionally reach, handle, finger, or feel. (R. 177.) Finally, Dr. Wrenn stated that Tippitt must lie down for two hours every morning and two hours every afternoon. (R. 178.)

## Law and Analysis

Issue No. 1: Whether the ALJ erred in finding that Tippitt had only two severe impairments.

The ALJ found that Tippitt suffered from nephrotic syndrome[4] and cardiomegaly (enlargement of the heart), but that those impairments did not meet or medically equal a listing. Tippitt argues that the ALJ did not evaluate all of his impairments, such as hypertension, angina, chronic anemia, and probably coronary

---

[4] According to medlineplus.gov, nephrotic syndrome is defined as a group of symptoms including protein in the urine (exceeding 3.5 grams per day), low blood protein levels, high cholesterol levels, and swelling (edema). The urine may also contain fat, which is visible under the microscope. http://www.nlm.nih.gov/medlineplus/ency/article/000490.htm

artery disease.[5] (Doc. #11, p.4.) While he did mention them in his analysis, the ALJ did not state why those impairments were not severe.

The undersigned notes that Tippitt does not present any argument that he meets or medically equals any of the listed physical impairments. There is substantial evidence to support the ALJ's determination that Tippitt has two severe impairments - nephrotic syndrome and cardiomegaly. There is evidence in the record of other impairments, but Tippitt does not argue or assert that he meets or medically equals any of those listings[6].

Issue No. 2: Whether the ALJ failed to give controlling weight to the opinion of Tippitt's treating cardiologist.

Next, Tippitt argues that the ALJ erred in failing to give controlling weight to his treating physician, Dr. Wrenn. The ALJ stated, "In this case, the October 2003 report of Dr. Wrenn is given little weight due to the inconsistencies between the report and the claimant's actual functioning and the lack of support in Dr. Wrenn's progress notes for the extreme nature of limitations assessed." (R. 23.) The ALJ noted that the physician's progress notes do not contain objective documentation in support of the

---

[5] Dr. Wrenn stated that he was unable to assess the underlying cardiac condition because of Tippitt's renal insufficiency.

[6] Tippitt does now argue that he meets a listing based on mild mental retardation, which will be discussed herein.

9

limitations reported in Wrenn's report. Specifically, the ALJ found that at an April 10, 2003 office visit, Dr. Wrenn reported that Tippitt was in no distress with a clear chest, regular heart rate, no edema and normal pedal pulses. While Wrenn reported a history of shortness of breath, none was reported in the physical examination on that day. (R. 23.) This is not sufficient reason to accord little weight to Dr. Wrenn's report. Just because there was no shortness of breath or distress at an April 10, 2003 office visit does not mean that Tippitt did not experience those symptoms.

Further, while the ALJ found little objective documentation supporting the limitations, the record is replete with objective findings: increase left ventricular mass, consistent with concentric hypertrophy (R. 100); positive H. Pylori Test (R. 101); bilateral medical renal disease of moderate severity (R. 105); mild cardiomegaly and hyperexpansion (R. 106); abnormal cardiolite stress test (R. 120); septal hypokinesis and anterior wall motion perfusion abnormality (R. 125); positive dyspnea (R. 127); consistently high levels of urea nitrogen, creatinine, and chloride (R. 137, 144, 173, 194, 199); consistently low white blood cell count, low red blood cell count, low hemoglobin, low hematocrit, low MCHC, and low platelet count (R. 140, 165, 195-197); abnormal ECG (R. 170).

The ALJ found, and the record clearly reflects, that Tippitt suffers from cardiomegaly and nephrotic syndrome. If the ALJ was

uncertain as to whether Dr. Wrenn's assessment of how limiting those conditions were, he could have called a medical expert to testify. It is obvious that the report given by the medical consultant, Hollis Rogers, was unhelpful to the ALJ, as he accorded that report limited weight, as well.

The ALJ gave little weight to the opinion of Dr. Wrenn because the progress notes did not have certain objective findings. However, the ALJ does not establish what, if any, objective findings should accompany Tippitt's diagnosed conditions. Tippitt consistently complained of shortness of breath and chest pains, and the numerous medical reports show that he suffers from real medical conditions that could potentially cause those symptoms. Dr. Wrenn opined that any amount of exertion could increase Tippitt's risk of a heart attack. The ALJ gave the opinion little weight without ever articulating exactly what objective findings were missing. This evidences a lack of the requisite understanding of the clinical signs or symptoms regarding Tippitt's condition and what they signify in terms of SSR 96-2. The undersigned finds that the record does not support the ALJ's determination that the treating cardiologist's report is entitled to only little weight. Upon remand, the ALJ should state what findings conflict with or contradict the opinion of Dr. Wrenn.

Additionally, as Tippitt noted in his brief, "Dr. Wrenn was unable to adequately assess the underlying cardiac condition, which

11

is probably coronary artery disease, due to claimant's renal insufficiency." (Doc. #11, p.4.) While Tippitt's renal condition prevented an full assessment of his condition, Dr. Wilson stated that Tippitt had been take off of the medication Accupril because it could be leading to that renal disease. (R. 130, 128, 131.) Tippitt's progress notes from Cenla Heart Specialists also reflect that, on September 23, 2002, Tippitt was instructed to stop taking Accupril. (R. 128.) However, subsequent progress notes indicate that Tippitt continued to take Accupril. (R. 161-170, 211-216.) It is unclear from the medical records why Tippitt continued taking Accupril or whether it was determined that Accupril was definitively causing or not causing the renal problems. This issue should be explored and clarified upon remand.

Issue No. 3: Whether the ALJ erred in finding that Tippitt was not wholly credible.

The ALJ found that Tippitt was not wholly credible because Tippitt testified that he sometimes cares for his one year old child and has to lift the baby into the playpen and that serves as an usher at church. First, there is no evidence in the record as to how much the baby weighs, how frequently Tippitt has to lift the baby, or for how long. Second, there is no evidence as to how frequently he ushers at church and how long that activity lasts each time. Additionally, the ALJ found that Tippitt enjoyed fishing; however, Tippitt testified that he hardly ever goes

fishing anymore and could not remember the last time he had been. (R. 230-231.) Also, Tippitt testified that he might grocery shop with his wife once a month, but she has to carry the grocery bags. (R. 229.)

According to the ALJ, the claimants activities were not consistent with Dr. Wrenn's report but were consistent with a full range of light work. Based on the record, there is not sufficient evidence to support the Commissioner's determination that Tippitt is less than credible or that his daily activities are consistent with a full range of light work.

Issue No. 4: Whether the ALJ erred in his reliance on the medical vocational guidelines to determine non-disability.

In light of the forgoing, the residual functional capacity assessment is not supported by substantial evidence. Furthermore, the record contains evidence that Tippitt is illiterate. If that is the case, reliance on the medical vocational guidelines is inappropriate. The ALJ declined to accept Tippitt's statement that he was illiterate because Tippitt completed eleventh grade and claims to play chess with his brother. (R. 24.) First, as the ALJ noted, the ability to read is not necessarily required to play chess, and playing chess is certainly not determinative of whether or not an individual can read. Second, simply because Tippitt finished the eleventh grade in the 1970s does not necessarily mean

that he is literate. Finally, while Tippitt submitted applications for social security benefits, he testified that his wife filled out those forms on his behalf. The record does not contain substantial evidence to support the Commissioner's rejection of Tippitt's claim that he is illiterate.

Issue No. 5:  Whether the Appeals Council failed to properly consider new and material evidence of mild mental retardation and significant adaptive deficits, and its impact on claimant's condition

Finally, Tippitt claims that the Appeals Council erred in rejecting a request that it review the ALJ's unfavorable decision in light of new and material evidence submitted. Specifically, Tippitt submitted to the Appeals Council a report from the Avoyelles Parish School Board dated November 23, 1979, stating that Tippitt was entitled to special education services. The report supports Tippitt's claim that he is illiterate and indicates that Tippitt was almost seventeen years old, but had mild mental retardation with a verbal mental age of about 9 years. (R. 206.) His expected level of achievement at age 16-17 was the fourth grade, but his word recognition, oral comprehension, silent comprehension, word accuracy, and vocabulary were in the range of below 1st grade to second grade.

While Tippitt has been able to maintain employment since that time, he has a rather unstable work history and has worked at eight

different jobs from 1991 through 2002. (R. 68.) Therefore, in addition to the forgoing reasons, the case should be remanded for a review of this new evidence and a determination of whether Tippitt meets the requirements of 12.05C.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the decision of the Commissioner be REVERSED and VACATED and that the case be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation. Specifically, the ALJ should:

(1) articulate exactly what objective findings were necessary in order for the ALJ to accord substantial weight to Dr. Wrenn opinion that any amount of exertion could increase Tippitt's risk of a heart attack; in other words, the ALJ should show what specifically objective findings should accompany Tippitt's diagnosed conditions;

(2) address the issue of the effect of Accupril on Tippitt's renal condition and his ability to undergo a catheterization to adequately assess Tippitt's condition;

(3) afford more credibility to Tippitt's complaints, or point out more substantial evidence to support a finding that Tippitt is less than credible;

(4) review the new evidence submitted by Tippitt and determine whether Tippitt meets the requirements of

12.05C.

If the ALJ determines that Tippitt does not meet listing 12.05, then the ALJ should:

(5) consider Tippitt's functional illiteracy in determining the residual functional capacity, or the ALJ should point to more substantial evidence that Tippitt is actually literate.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 8th day of August, 2006.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE